## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

| | | |
|---|---|---|
| **OLAND SMITH** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL CASE NO.: 2:20-cv-00366** |
| **v.** | ) | |
| | ) | |
| **ATLANTIC COMMTECH CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |

Serve:
Atlantic Commtech Corporation
Attn:  Tina Lavonne Ridgeway, Registered Agent
2509 Walmer Avenue
Norfolk, Virginia 23513

## COMPLAINT

NOW COMES the Plaintiff, Oland Smith ("Smith"), by counsel, and for his Complaint against the Defendant, Atlantic Commtech Corporation ("ACT"), and states as follows:

### The Parties

1.   Smith is an individual who is domiciled in Warner Robins, Georgia.

2.   ACT is a Virginia stock corporation with a principle office located in Norfolk, Virginia.

### Jurisdiction

3.   Personal jurisdiction over the Defendant exists in Virginia because it is a Virginia stock corporation.

4.   Subject matter jurisdiction exists through federal question jurisdiction because ACT violated 29 U.S.C. § 206.  This Court has subject matter jurisdiction over the remaining state claims through its supplemental jurisdiction because these claims result from the same transaction or

occurrence as the federal claim.

## Venue

5.   Venue is proper in this Court because ACT's principle place of business is located in Norfolk, Virginia.

## Facts

6.   Beginning in July of 2011, Smith was a salaried employee of Lockheed Martin Corporation ("Lockheed Martin"), providing logistical support to the US Airforce/AFCENT A6 within Qatar on Al Udeid Airbase (the "Mission").

7.   Eventually, Smith switched employment from Lockheed Martin to a salaried employee of General Dynamics Corporations ("General Dynamics"), however he maintained the same Mission.

8.   The gist of Smith's Mission in support of the US Airforce was to ensure that supply orders were fulfilled and directed to the proper recipient at various locations in the Middle East and other locations with the presence of US military forces.

9.   Among other things, this entailed tasks such as receiving shipment requests from the U.S. Airforce and/or its contractors and filling out the proper documentation, such as Requisition and Shipping Documents ("DD FORM 1149"), and then forwarding such forms to the U.S. Airforce to prepare and ship the specific items in accordance with the documents ("General Cargo Requests").

10. Prior to and concurrently to Smith's time in Qatar, ACT was also contracted and paid to perform logistical work at the same location.  Upon information and belief, ACT was originally a subcontractor to Lockheed Martin or one of its subsidiaries.  Among other duties, ACT was responsible for shipping "Uninterrupted Power Supplies" and related power equipment ("UPS

Items").

11. In fulfilling the shipment of the UPS Items, ACT was required to perform shipping methods that went beyond General Cargo Requests. Shipping UPS Items often required physical work beyond filling out forms and directing cargo, thus necessitating many more hours of work and a higher degree of proficiency ("ULN Cargo Requests"). The reason for this is because, unlike General Cargo Requests, ULN Cargo Requests involved actually performing the physical shipment process, as opposed to merely filling out the forms and forwarding the same to Airforce personnel to fulfill.

12. In order to facilitate these duties under its subcontract, ACT had routinely requisitioned Lockheed Martin employees to complete this logistical work, although it is unclear if ACT was authorized to do this. This included using Smith's predecessor whom Smith replaced in 2011, and then Smith himself.

13. Upon information and belief, sometime in 2012, ACT was awarded the contract that it was originally subcontracted to perform under Lockheed Martin, which entailed the logistical support of shipping UPS Items described previously ("UPS Contract").

14. Up until this point, Smith has assisted ACT with its subcontract duties because Smith was an employee of the prime contractor, Lockheed Martin. However, once ACT became the prime contractor under the UPS Contract, Smith was no longer required to assist ACT (although it is questionable if he was ever required to), because ACT was no longer a subcontractor for Lockheed Martin.

15. This meant that Smith was now only required to provide logistical support for non-UPS "Commercial Off the Shelf" items ("COTS Items") and General Cargo Requests that Lockheed Martin was still responsible for.

16. Despite the award of the UPS Contract to ACT, no announcement was made to Smith by either Lockheed Martin or ACT.  ACT, however, knew through its Performance Work Statement from the Airforce that it was completely responsible for providing its own logistical support to fulfill its new duties under the UPS Contract.  Among other things, this meant providing and training its own employees.

17. However, instead of providing its own staff, ACT continued to requisition Lockheed Martin employees to perform these tasks, including Smith.  Unknown to Smith, this additional work for ACT was outside of the scope of his contract with Lockheed Martin, thus Smith was not paid for this work by Lockheed Martin or ACT.

18. This work for ACT included things such as, but not limited to: consulting while on vacation or end of duty; shipping ULN Cargo Requests as opposed to General Cargo Requests; shipping UPS Items; working whenever needed to meet ACT specific shipment goals; and working outside of his normal working hours, including after midnight, to ensure ACT cargo was shipped ("Additional Work").

19. This Additional Work continued both during Smith's employment with Lockheed Martin and his current employment under General Dynamics.

20. As described above, ACT was fully aware that this Additional Work was outside of Smith's contract with his employer yet nevertheless represented to Smith that he was required to complete this work.

21. These representations usually came in the form of emails from ACT employees, such as Chris Wunschel or Rick Smith, instructing Oland Smith what items needed to be shipped, how to ship them, to where, to whom, and the timeline.  One example of such communication is attached hereto as Exhibit A.

4

22. These emails communications were further memorialized by Smith when Smith would transfer this information directly into the DD FORM 1149.  One example of such a form is attached hereto as Exhibit B.  These DD FORMS 1149 memorialized the exact requests coming from ACT employees.

23. ACT not only made these representations to Smith, but also to the Airforce, whom both Lockheed Martin/General Dynamics and ACT were contractors for.  Thus, even the Airforce mistakenly associated Smith with ACT and the UPS Contract.

24. The implications of this incorrect association were profound.  Ultimately, the Airforce was the customer, and therefore set the requirements for all of its logistics contractors.  Thus, Smith's performance of job functions under the UPS Contract to ACT's and the Airforce's satisfaction would ultimately determine Smith's reputation in the small community in the A6 at Al Udeid Airbase.

25. At any point in time, ACT had the ability to tell Smith to cease all work under the UPS Contract for whatever reason it wanted, including poor performance, which ultimately would have affected Smith's primary job with Lockheed Martin/General Dynamics if Smith acquired a bad reputation with the Airforce.

26. ACT was fully aware that this Additional Work was outside of the scope of Smith's contract with both Lockheed Martin and General Dynamics and their respective contracts with the Airforce.  Nevertheless, ACT sent these requests to Smith as though Smith was fulfilling his Mission by assisting ACT.

27. Indeed, Smith had even approached the ACT program manager inquiring as to the scope of this Additional Work to which he was informed that ACT was A6 and therefore assisting ACT was his responsibility.

28. ACT benefitted from Smith's "free labor" because the UPS Contract was a "firm fixed" contract. This meant that regardless of the labor and costs expended by ACT, it would receive the same contracted price from the U.S. Airforce.

29. Because Smith was working for ACT without compensation, ACT did not have to hire an employee to fulfill Smith's role, which would have cost ACT approximately $50,000.00 per year plus the cost of living for such an employee.

30. By receiving the benefit of Smith's labor, without ever paying Smith, ACT received an approximate value of $400,000.00 in free labor over the course of the eight-year period that ACT engaged in this fraud, not including living expenses. This amount was pure profit for ACT given the "firm fixed" contract it had with the Airforce, and it was a pure loss for Smith.

31. Once Smith discovered that the Additional Work was outside of the scope of this General Dynamic's contract with the Airforce, Smith realized that he had suffered countless hours of work over the course of eight years that he was never paid for.

32. Smith immediately brought the fact that he was performing this Additional Work to his superiors at General Dynamics and Airforce leadership, to which he was instructed by both to cease all work for ACT.

## COUNT I
## VIOLATION OF FAIR LABOR STANDARDS ACT (29 U.S.C. § 206)

33. Smith repeats and re-alleges paragraphs 1–32 as if fully set forth herein.

34. ACT was an "employer" and Smith was an "employee" under 29 U.S.C. § 203 because ACT directed and permitted Smith to perform the Additional Work for the benefit of ACT, to which Smith did perform such work in his individual capacity and outside of the scope of his other employment with General Dynamics.

35. ACT directed the time, place, and manner of Smith's execution of the Additional Work

and left little to Smith's own discretion.  ACT either on its own or through the Airforce also provided the tools and equipment that Smith would need to complete the work under the UPS Contract.

36. ACT had the ability to fire Smith from performing any work under the UPS Contract for whatever reason ACT wanted because it was ACT's responsibility, as reflected in the Performance Work Statement, to provide logistical support.  Thus, this logistical support position must have been filled by ACT employees.

37. Because of ACT's representations, both Smith and the Airforce believed that Smith was associated with the UPS Contract.  Therefore, Smith's ability to make a living completely depended on his ability to fully perform the job functions under the UPS Contract, because a poor reputation with the Airforce would ultimately dictate Smith's ability to perform any work in the A6, whether with ACT or Lockheed Martin/General Dynamics.

38. Smith would perform this Additional Work for ACT weekly and as often as daily, depending on the needs of ACT.

39. Smith performed this Additional Work under this employment relationship with ACT and was never compensated any wage for the time he spent completing the Additional Work, including but not limited to completing any ULN Cargo Requests or shipping UPS Items.

40. Given the Performance Work Statement pursuant to the UPS Contract, ACT was fully aware that the Additional Work fell outside of the scope of Lockheed Martin/General Dynamic's contract with the Airforce, thus the Additional work was also outside of the scope of Smith's contract with Lockheed Martin/General Dynamics.  Therefore, ACT was using Smith in his individual capacity to perform labor under the UPS Contract and ACT's failure to pay Smith was willful.

41. As a result, ACT violated 29 U.S.C. § 206 by not paying Smith the minimum statutory wage.

42. Smith has suffered approximately $50,000.00 each year for the past eight years in direct damages from lost compensation.

43. Pursuant to 29 U.S.C. § 216, ACT is also responsible for $150,000.00 in liquidated damages, representing an amount equal to the previous three years of unpaid labor from Smith.

44. Pursuant to 29 U.S.C. § 216, ACT is also responsible for the reasonable attorney's fees that Smith suffers as a result of bringing this action for reimbursement of unpaid wages.

**COUNT II**
**UNJUST ENRICHMENT**

45. Smith repeats and re-alleges paragraphs 1–44 as if fully set forth herein.

46. Since as early as 2011, Smith committed to the Additional Work for ACT without being compensated.

47. Given the Performance Work Statement pursuant to the UPS Contract, ACT was fully aware that the Additional Work fell outside of the scope of Lockheed Martin/General Dynamic's contract with the Airforce, thus the Additional work was also outside of the scope of Smith's contract with Lockheed Martin/General Dynamics.   Therefore, ACT was using Smith in his individual capacity to perform labor under the UPS Contract and ACT's failure to pay Smith was willful.

48. ACT never reimbursed Smith for this Additional Work and benefited $50,000.00 each year for the past eight years in free labor, not including the costs of living.

49. As a result, Smith committed to countless hours of Additional Work on top of his paid work for Lockheed Martin/General Dynamics, often sacrificing his own time off and vacation time to accomplish ACT's mission and should be reimbursed the fair market value of his labor,

approximately $50,000.00 per year.

## COUNT III
## FRAUD

50. Smith repeats and re-alleges paragraphs 1–49 as if fully set forth herein.

51. As described above and reflected in both Exhibits A and B, ACT falsely represented to Smith through both word and deed, that the Additional Work was Smith's responsibility under his contract with Lockheed Martin/General Dynamics.

52. Since as early as 2011, ACT not only issued work orders to Smith under the guise of authority, but also verbally instructed him that such work orders were his responsibility.

53. These actions and statements were false.  Smith was never required to do any of the Additional Work under his contract, thus Smith was performing work solely for the benefit of ACT.

54. Given the Performance Work Statement pursuant to the UPS Contract, ACT was fully aware that the Additional Work fell outside of the scope of Lockheed Martin/General Dynamic's contract with the Airforce, thus the Additional work was also outside of the scope of Smith's contract with Lockheed Martin/General Dynamics.  Therefore, ACT intended to make these false statements so it could benefit from free labor.

55. Because the Additional Work was so similar to his actual work for Lockheed Martin/General Dynamics, and because initially Lockheed Martin was the actual prime contractor of the UPS Contract, Smith reasonably relied on these false representations from ACT to his detriment and was never put on notice nor was there reason to believe that such statements could be false.

56. As a result of ACTS fraud, Smith has suffered $400,000.00 in direct damages, which represents $50,000.00 for every year Smith performed such work over the past eight years.

### COUNT IV
### CONSTRUCTIVE FRAUD
### (in the alternative to Count III)

57. Plaintiff repeats and re-alleges paragraphs 1–56 as if fully set forth herein.

58. As described above and reflected in both Exhibits A and B, ACT falsely represented to Smith through both word and deed, that the Additional Work was Smith's responsibility under his contract with General Dynamics.

59. Since as early as 2011, ACT not only issued work orders to Smith under the guise of authority, but also verbally instructed him that such work orders were his responsibility.

60. These actions and statements were false.  Smith was never required to do any of the Additional Work under his contract, thus Smith was performing work solely for the benefit of ACT.

61. Because the Additional Work was so similar to his actual work for Lockheed Martin/General Dynamics, and because initially Lockheed Martin was the actual prime contractor of the UPS Contract, Smith reasonably relied on these false representations from ACT to his detriment and was never put on notice nor was there reason to believe that such statements could be false.

62. Due to the preexisting relationship as subcontractor for Lockheed Martin, ACT either innocently or negligently continued to use Lockheed Martin/General Dynamic employees to complete the work under the UPS Contract.

63. As a result of ACT's fraud, Smith has suffered $400,000.00 in direct and consequential damages, which represents $50,000.00 for every year Smith performed such work over the past eight years.

WHEREFORE, in consideration of the foregoing, the Plaintiff, Oland Smith, respectfully prays that he be granted judgment against the Defendant, Atlantic Commtech Corporation, as follows:

A.      Direct and consequential damages in the amount of $400,000.00;

B.      Liquidated damages in the amount of $150,000.00;

C.      Punitive damages of $350,000.00;

D.      Plaintiffs' Attorneys' fees and costs incurred in pursuing this action pursuant to the FLSA violation (29 U.S.C. § 216); and

E.      Such other and further relief as to the Court may seem just and equitable.

The Plaintiff demands a trial by jury for all issues so triable.


Respectfully Submitted,

OLAND SMITH


By:  ___/s/ Justin R. Burch___
                *of counsel*


Justin R. Burch (VSB # 92135)
Christopher D. Davis (VSB# 74809)
Davis Law, PLC
1403 Greenbrier Pkwy., Suite 225
Telephone number: 757-277-6772
Fax number: 757-257-8614
justin@davislawplc.com
chris@davislawplc.com